# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **MARY FREDENHAGEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 09 C 4936** |
| | ) | |
| | ) | |
| **v.** | ) | **Magistrate Judge Susan E. Cox** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Mary Fredenhagen, seeks judicial review of an Administrative Law Judge's decision denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1] Plaintiff has filed a motion for summary judgment in favor of reversal and remand of the decision while the defendant, the Commissioner, has filed a cross-motion for summary judgment to affirm the decision. For the reasons herein, plaintiff's motion for remand is granted [dkt 17] and defendant's motion is denied [dkt 19].

## I. PROCEDURAL HISTORY

On June 26, 2006, plaintiff filed an application claiming a period of disability beginning on April 4, 2004.[2] She claimed disability on the basis of bipolar disorder, high blood pressure, and Graves' disease.[3] The Social Security Administration ("SSA") denied plaintiff's application on

---

[1] 42 U.S.C. § 405(g).
[2] R. at 80.
[3] R. at 86.

December 12, 2006 and again on April 18, 2007.[4] The SSA subsequently granted her request for a hearing before an Administrative Law Judge ("ALJ"). On December 3, 2008, plaintiff appeared before ALJ Kenneth Stewart.[5] The ALJ determined that plaintiff was not disabled as of April 4, 2004[6], and on June 19, 2009, the Appeals Council of the SSA denied her request for review.[7] As a result, plaintiff filed this claim for judicial review of the ALJ's decision.

## II.    STATEMENT OF FACTS

Plaintiff was born on March 15, 1949 and was fifty-nine years old when she appeared before the ALJ.[8] By April 4, 2004, the alleged date of disability onset, plaintiff was fifty-five and thus had reached advanced age for Social Security purposes.[9] She graduated from high school in 1967.[10] Plaintiff's most recent sustained employment was from 1985 to 2004 as a switchboard operator and receptionist for a bank.[11] She described the work as "fast-paced" and claims to have enjoyed the busyness of the job.[12] It is unclear why plaintiff left her job initially, but she has not sustained employment since April 4, 2004.[13] She claims that difficulty concentrating and fatigue associated with her conditions keep her from being able to work.[14]

## A.    Medical History

The court record does not contain plaintiff's full medical history. Medical records from the Hinsdale Family Medical Center ("HFMC") contain a chart listing plaintiff's medications from June

---

[4] R. at 80-86.
[5] R. at 18.
[6] *Id.*
[7] R. at 1.
[8] R. at 54.
[9] 20 C.F.R. Part 404, Subpart P, § 201.00(d).
[10] R. at 126.
[11] R. at 57.
[12] R. at 58-59.
[13] R. at 56.
[14] Pl.'s Br. 2.

2, 1997 to October 9, 2006 and notes from doctor's visits covering the period of April 8, 2004 to October 27, 2006.[15] These records confirm that plaintiff was receiving treatment for bipolar disorder, Graves' disease, sinusitis, and hypertension.[16] Bipolar disorder is a mood disorder characterized by alternating periods of depression and manic episodes.[17] Graves' disease is a disorder characterized by the overactivity of the thyroid gland, which controls metabolism.[18] Sinusitis is an inflammation of the sinuses caused by a viral, bacterial, or fungal infection.[19] Hypertension is the term used to describe high blood pressure.[20] Smitha Rajasekhar, M.D. was plaintiff's primary care provider at HFMC at least since the spring of 2006, though the record is unclear on exactly how long plaintiff has been seeing this provider.[21]

Plaintiff was diagnosed with bipolar disorder around 1987, following the birth of her third child.[22] Her physicians have been able to control her condition through the prescription of lithium, which plaintiff has been taking for roughly twenty-five years.[23] The dosage has remained unchanged during that time and the patient described her symptoms as "very controlled."[24]

On June 26, 2006, plaintiff underwent a thyroid scan confirming bilateral thyroid enlargement compatible with Graves' disease.[25] At an appointment on June 16, 2006 the plaintiff indicated to her physician that she had been fatigued for the last six months.[26] Following the scan

---

[15] R. at 193-228.
[16] R. at 194-207.
[17] *Black's Medical Dictionary* 79 (41st ed. 2006).
[18] *Id.* at 710-11.
[19] *Id.* at 646.
[20] *Id.* at 343.
[21] R. at 25, 125.
[22] R. at 68, 211.
[23] R. at 69.
[24] R. at 69, 208.
[25] R. at 227.
[26] R. at 203.

and diagnosis, she began treatment with propylthiouricil.[27] After June 2006, the HFMC medical records do not indicate complaints of fatigue.[28] By March 2007, plaintiff's thyroid profile tested in the normal range.[29]

Plaintiff's medical records indicate that she sought treatment for chronic sinusitis and jaw pain at various times from 2006 to 2008.[30] An MRI on April 16, 2007, confirms mucosal thickening in the left maxillary sinus consistent with sinusitis.[31] Records from a visit with Marie Shelton, D.O., in March 2008, report that recurrent sinus infection, trauma, and facial pain are related to injuries plaintiff sustained in a 1979 motor vehicle accident.[32] Dr. Shelton notes that symptoms include facial tenderness and nasal congestion.[33] Plaintiff has tried multiple medications, but has not had surgery to alleviate the congestion and pain.[34]

On November 15, 2006, plaintiff was examined by an internist, Zain Syed, M.D., for the purposes of Social Security proceedings.[35] Dr. Syed noted plaintiff's major complaints were fatigue and lack of concentration, which he found could both be related to her bipolar disorder. He mentioned her history of Graves' disease, hypertension, and a possible diagnosis of tachycardia.[36]

On November 27, 2006, psychiatrist Joseph Nemeth, M.D., conducted a psychiatric evaluation of plaintiff for the SSA.[37] With regard to her bipolar disorder, she reported feeling "more stable" on Lithium, but also admitted that she has had periods of poor concentration, depression, and

---

[27] R. at 203, 67.
[28] R. at 194-202.
[29] R. at 280.
[30] R. at 194-200, 304-13.
[31] R. at 283.
[32] R. at 307, 312.
[33] R. at 307.
[34] R. at 307.
[35] R. at 232-34.
[36] R. at 234.
[37] R. at 229-30.

lack of energy.[38]  Dr. Nemeth noted that her sleep and mood seemed stable and recommended that

plaintiff was capable of handling her own funds.[39]

On December 8, 2006, psychologist R. Leon Jackson, Ph.D., completed a Psychiatric Review

Technique report for the SSA.[40]  He indicated mild limitations in plaintiff's activities of daily living,

social functioning, concentration, persistence, and pace.[41] He also reported that plaintiff had one or

two episodes of decompensation.[42] Dr. Jackson checked the box declaring plaintiff's bipolar disorder

"not severe,"[43] while noting that she may be limited to "simple and routine work."[44] In his notes he

reports the following:

> no evidence that the alleged mental impairment is sufficient severe to prevent the claimant
> from participating in handling her own funds or participating in simple and routine work
> activities; therefore, based upon the medical evidence in record the alleged mental
> impairment does not meet, equal, or functionally equal the severity of functional limitations.
> The current application is assessed to be non-severe.[45]

Also on December 8, 2006, Frank Jimenez, M.D., completed a physical residual functional

capacity assessment form for plaintiff's SSA disability application.[46] He reported that she could

occasionally lift fifty pounds, frequently lift twenty-five pounds, stand and walk six hours in an

eight-hour day, and had no limits in her ability to push and pull.[47] Dr. Jimenez noted no other

limitations to plaintiff's physical ability to work.[48]

Dr. Rajasekhar completed a medical evaluation form on January 3, 2007, from the Illinois

---

[38] R. at 229.
[39] R. at 230.
[40] R. at 236-49.
[41] R. at 246.
[42] *Id.*
[43] R. at 236.
[44] R. at 248.
[45] R. at 248.
[46] R. at 250-57.
[47] R. at 251.
[48] R. at 250-57.

Department of Human Services.[49] Dr. Rajasekhar managed plaintiff's bipolar disorder and plaintiff would only see a psychiatrist as needed.[50] With regard to plaintiff's bipolar disorder, Dr. Rajasekhar indicated no limitations to plaintiff's activities of daily living, mild limitations on social functioning, concentration, persistence, and pace and no episodes of decomposition.[51]

## B.    December 3, 2008, Hearing before the ALJ

Plaintiff appeared before ALJ Stewart on December 3, 2008. She was represented by counsel, Marcie Goldbloom. Medical Expert ("ME") John Cavenagh, M.D., testified as well as Vocational Expert ("VE") Thomas Gusloff.[52] Plaintiff first responded to questions by the ALJ and her attorney about her previous work. Plaintiff described her most recent long-term employment from 1998 to 2004 as a receptionist and switchboard operator for a bank.[53] She interacted with customers and employees, routed calls to the appropriate departments, and was occasionally tasked with training others on the switchboard.[54] Then the ALJ questioned the VE only about plaintiff's previous employment. The VE testified that the exertional level for a receptionist and switchboard operator is sedentary and the skill level was at the upper end of semi-skilled.[55] That was the extent of the VE's testimony.  Plaintiff's counsel chose not to question the VE further.

The ALJ also questioned plaintiff about her bipolar disorder.  She testified that she has had the disorder for more than twenty-five years.[56] While she said she has seen a psychiatrist in the past, her primary care physician has been able to manage the illness for many years.[57]  Plaintiff reported

---

[49] R. at 261-67.
[50] R. at 68, 232.
[51] R. at 262.
[52] R. at 51-79.
[53] R. at 57-61.
[54] Id.
[55] R. at 62.
[56] R. at 69.
[57] Id.

that she has been taking the same dosage of lithium for about 25 years.[58]

Plaintiff's counsel went on to question her about the effects of fatigue in her daily activities. Plaintiff testified that she feels congested and tired in the morning and the tiredness never goes away throughout the day.[59] She claimed that the constant congestion makes it difficult for her to breathe and requires her to use more energy.[60] She speculated that she would not be able to perform her previous work activities because she would become tired during the work week and need to call in frequently. She said, "I'd be calling in and then they'd probably fire me."[61] Plaintiff testified that she has to lay down and rest at least once a day and the naps do not help her feel more rested.[62] She only leaves the house a couple times a week to visit her mother or children.[63] Plaintiff explained that she makes simple meals for herself throughout the week and that her daughter has helped her clean her home on a few occasions.[64] Plaintiff's family used to bring her food, but now she is able to manage meals on her own.[65]

As to her ability to concentrate, plaintiff testified that she sometimes has to read things twice to comprehend or has to ask people to repeat themselves in conversations in order to recall particular details.[66] She described a job that she held briefly in 2007 as a demonstrator for sunrooms.[67] Plaintiff reported that she was fired from that job after a couple of days for not being able to accurately explain the details of the products to prospective customers.[68] That said, plaintiff also testified that

---

[58] *Id.*
[59] *Id.*
[60] R. at 71-72.
[61] R. at 71.
[62] R. at 71.
[63] R. at 70.
[64] R. at 75.
[65] *Id.*
[66] R. at 70.
[67] R. at 72-73.
[68] R. at 73.

she can handle stress "pretty good."[69] Ms. Goldblum asked about a questionnaire plaintiff's sister completed indicating that plaintiff does not handle stress well.[70] Plaintiff explained that her sister completed the form in 2006, at the height of her difficulties with Graves' disease.[71] Plaintiff reported that now she does not frequently experience increases in her heart rate or have dizziness and she no longer has headaches.[72] Plaintiff also discussed her left side facial pain related to the 1979 car accident.[73] She explained, "the accident [...] knocked my teeth out and just totally wrecked my bone, jawbone."[74] She reported that she currently takes medication at night to help relax her jaw and explained that the pain was "not as bad now."[75]

Dr. Cavenagh, the ME, testified that either plaintiff's bipolar disorder or Graves' disease could cause fatigue or difficulty with concentration.[76] The Graves' disease was diagnosed and treatment began in June 2006.[77] He noted that since March 2007 plaintiff's thyroid profile has been in the normal range.[78] Dr. Cavenagh also noted plaintiff's complaint of facial pain for more than ten years. He commented that the Graves' disease is controlled with propylthiouracil and that there is no functional impairment documented.[79] Dr. Cavenagh also testified that none of plaintiff's medications should cause fatigue or lack of concentration.[80] He then concluded by stating "the evidence that I have here does not meet or equal a listing."[81]

---

[69] *Id.*
[70] R. at 73-74.
[71] *Id.*
[72] R. at 74.
[73] R. at 72.
[74] *Id.*
[75] *Id.*
[76] R. at 66.
[77] *Id.*
[78] R. at 67.
[79] *Id.*
[80] R. at 75-76.
[81] R. at 67.

## C.    ALJ's Decision

On January 6, 2009, the ALJ determined that plaintiff was not entitled to disability benefits under sections 216(i) and 223(d) of the Social Security Act.[82] The ALJ applied the five-step sequential evaluation for determining disability.[83] He found that plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 4, 2004.[84] Next, the ALJ determined that Graves' disease and bipolar disorder were severe impairments in accordance with 20 C.F.R. § 404.1521.[85]

The ALJ also discussed plaintiff's other ailments - hypertension, chronic sinusitis, and facial pain - but determined that they did not meet or equal the listing of impairments in Appendix 1.[86] He noted that hypertension is not recognized by the impairment listings in Appendix 1 and plaintiff's medical record does not indicate problems controlling the condition.[87] As to chronic sinusitis and facial pain, the ALJ again noted that the conditions are not listed in Appendix 1.[88] He identified two computed tomography ("CT") scans and a magnetic resonance imaging ("MRI") test that confirmed "mucosal thickening" and "mild inflammatory changes of the left maxillary sinus" consistent with sinusitis.[89] He also identified a doctor appointment in April 2007 where plaintiff sought treatment for her facial pain and the physician recommended dental, temporomandibular joint ("TMJ"), and neurologic evaluations.[90] He also recounted an appointment in July 2008 where she presented with

---

[82] R. at 18.
[83] 20 C.F.R. § 404.1520(4)(i)-(v).
[84] R. at 20.
[85] Id.
[86] R. at 20.
[87] Id.
[88] Id.
[89] R. at 20-21.
[90] R. at 21.

facial pain and was prescribed Elavil.[91] However, he discounted plaintiff's claim that these conditions exacerbated her feelings of fatigue or decreased her ability to concentrate.[92] The ALJ explained that "while the claimant did seek often treatment for sinusitis, she never reported that the increasing symptoms made her more tired or less able to concentrate."[93]

Step three of the evaluation requires the ALJ to determine whether plaintiff has an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.[94] In considering step three the ALJ focused on evaluating plaintiff's Graves' disease and bipolar disorder. The ALJ analyzed two separate listings relevant to Graves' disease: 9.02 Thyroid disorders and 9.03 Hyperparathyroidism.[95] Listing 9.02 requires the ALJ to consider the affected body system. But in his decision the ALJ noted that the medical record lacked documentation of the affected body system and therefore made a determination impossible under the criteria.[96] Listing 9.03 requires a showing of bone decalcification indicated by elevated calcium plasma levels or an impairment caused by increased thyroid hormones evaluated by the criteria for the affected body system.[97] The ALJ explained that plaintiff's record again did not demonstrate increased calcium levels or an impairment to an affected body system and therefore prohibited a finding under the criteria.[98]

Regarding plaintiff's bipolar disorder, the ALJ analyzed the evidence against the criteria for listing 12.04 Affective disorders.[99] Under this listing, a mental impairment is considered severe if

---

[91] *Id.*
[92] *Id.*
[93] *Id.*
[94] R. at 21.
[95] *Id.*
[96] *Id.*
[97] 20 C.F.R Part 404, Subpart P, Appendix 1.
[98] R. at 22.
[99] *Id.*

it results in (1) marked limitations in at least two of the following: activities of daily living; maintenance of social functioning; or maintenance of concentration, persistence, and pace; or (2) marked limitations in one of those areas and repeated episodes of decompensation.[100] These elements are known as the B-criteria.[101] The ALJ adopted Dr. Rajasekhar's assessment of these criteria and noted that plaintiff's bipolar disorder resulted in no limitations to activities of daily living and no repeated episodes of decompensation and only mild limitations in social functioning and concentration, persistence, and pace.[102] As such the ALJ concluded that the bipolar disorder did not satisfy the requirements of listing 12.04 for affective disorders to warrant a finding of disability.[103]

The ALJ moved on to establish that plaintiff had the residual function capacity ("RFC") to perform the full range of sedentary work under 20 C.F.R. § 404.1567(a).[104] While he found that plaintiff's ailments could reasonably be expected to produce fatigue and difficulty concentrating, the ALJ did not fully credit plaintiff's testimony about intensity, persistence, and functional limitations.[105] The ALJ only found her testimony credible in as much as it was consistent with the RFC allowing for the performance of the full range of sedentary work.[106] In support of this conclusion, he cited testimony from Dr. Cavenagh that plaintiff's thyroid profile was testing normal and that her Graves' disease was controlled.[107] The ALJ also reiterated Dr. Rajasekhar's assessment of plaintiff's bipolar disorder, namely that she had no limitations in her daily activities and only mild

---

[100] 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 12.04 (providing that episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment, i.e. significant alterations in medication, hospitalization, placement in a halfway home, or highly structured living facility. Repeated episodes of decompensation means three in one year, each period lasting two weeks or more).
[101] *Id.*
[102] R. at 22.
[103] *Id.*
[104] R. at 23.
[105] R. at 23-25.
[106] R. at 24.
[107] *Id.*

limitations in social functioning, concentration, persistence, and pace.[108] The ALJ also noted plaintiff's own statements to her physician that her symptoms are "very controlled" and that she feels stable on her lithium.[109] As to plaintiff's testimony on her daily routine, the ALJ said, "it is significant that with decrease of the effects of Graves' disease upon her, the claimant's family found it less necessary to provide her help."[110]

The ALJ placed little weight on the findings of Dr. Jimenez who indicated that plaintiff could perform a medium level of exertion.[111] He believed that this finding was not consistent with the weight of medical evidence in the case.[112] The ALJ also afforded little weight to Dr. Jackson's psychiatric assessment, saying it also failed to reflect the medical record. He explained that Dr. Jackson indicated in his assessment that plaintiff had one to two periods of decompensation but plaintiff only reported hospitalizations occurring in the 1980's, which did not affect of relate to her present complaints or ailments.[113]

The ALJ also addressed plaintiff's contention that he should give more weight to the narrative portion of Dr. Jackson's assessment. The ALJ notes in his opinion that plaintiff's counsel "emphasized that the declaration the impairment is non-severe in the narrative statement should hold greater weight than the check-off box that presents the same information." But the ALJ considered this interpretation predicated on an inconsistency that was not there: in the same sentence the doctor determined plaintiff's condition was non-severe. The ALJ, therefore, concluded that Dr. Jackson's assessment meant that there was no psychological limitation to her ability to work.

---

[108] R. at 25.
[109] *Id.*
[110] R. at 24.
[111] R. at 25.
[112] *Id.*
[113] R. at 25.

The ALJ concluded his analysis by finding that plaintiff would be able to resume her previous employment as a receptionist/switchboard operator. Plaintiff's RFC allowed the performance of sedentary work and, consistent with the testimony of the VE, plaintiff's previous job was sedentary.[114] Based on this finding, the ALJ held plaintiff was not disabled.

## III.    STANDARD OF REVIEW

The court performs a *de novo* review of the ALJ's findings of law to determine whether the decision is supported by substantial evidence.[115] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[116] The factual determinations made by the ALJ are entitled to deference from the court.[117] The court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general substitute [its] judgment for the Commissioner."[118] Instead, if the determination of the ALJ is supported by substantial evidence, it is controlling.[119]

---

[114] *Id.*
[115] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[116] *Richardson v. Perales,* 402 US 389, 401 (1971).
[117] *Prochaska*, 454 F.3d at 734.
[118] *Young v. Barnhart,* 362 F.3d 995, 1001 (7th Cir. 2004).
[119] *Jens v. Barnhart,* 347 F.3d 209, 212 (7th Cir. 2003).

## IV.  SOCIAL SECURITY REGULATIONS

The Social Security Regulations require the application of a five-step sequential evaluation in order to determine whether a claimant is disabled.[120] The ALJ must consider: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant, based on his or her RFC, is unable to perform his past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[121]

## V.  ANALYSIS

Plaintiff argues that the ALJ's decision must be reversed or at least remanded because the decision was not supported by substantial evidence and was the result of legal error. Specifically, plaintiff asserts that: (1) the ALJ committed legal error in his failure to find non-exertional limitations to her ability to perform her previous work; and (2) the ALJ erroneously discredited her credibility.[122] Plaintiff contends that had the ALJ found limits to her ability to perform semi-skilled work, consistent with Commissioner's Medical Vocational Guidelines (i.e., the Grid), plaintiff would be classified as disabled based on her advanced age.[123]

---

[120] 20 C.F.R. §§ 404.1520, 416.920.
[121] Id.
[122] Pl.'s Br. 9-11.
[123] 20 C.F.R. Appendix 2,  Rule 201.06.

## A.    The ALJ's Determination of Severity at Step Two

In step two of the five-step sequential evaluation, the ALJ found that plaintiff's bipolar disorder and Graves' disease were severe.[124] Plaintiff seeks a RFC that reflects a non-exertional limit on her ability to work. Non-exertional limitations affect a claimants' ability to meet the demands of a job not related to strength requirements.[125] Here, plaintiff complains of fatigue and difficulty concentrating. Plaintiff argues that since the ALJ declared plaintiff's Graves' disease and bipolar disorder severe at step two, he should have also found a non-exertional limitation on her ability to work. Plaintiff cites no case law to demonstrate that a finding of severity at step two of the evaluation requires the ALJ to declare a non-exertional limit to plaintiff's ability to work. However, the Commissioner argues that the ALJ's finding of severity at step two was, at most, a harmless error. Then the Commissioner only provides a cursory analysis of the assertion that the ALJ committed a harmless error.  That said, we will conduct a full analysis of the law to determine the appropriate resolution.

As was noted in the Commissioner's response, in *Hickman v. Apfel*, the Seventh Circuit explained that step two of the sequential evaluation, which considers whether the claimant has a severe medically determinable physical or mental impairment, is a threshold determination.[126]  The court explained that not all severe impairments will meet or medically equal the listings in Appendix 1.[127] A determination of severity at step two allows the ALJ to continue his analysis of the claimant's condition to determine whether a disability exists.[128] Here, the ALJ continued his analysis of

---

[124] R. at 20.
[125] 20 C.F.R. § 404.1569a(c).
[126] 187 F.3d 683, 688 (7th Cir. 1999).
[127] *Id.*
[128] 20 C.F.R. § 404.1520(c).

plaintiff's condition through a determination of her RFC, which he used to assess plaintiff's ability to perform her previous work.

There is, however, a slightly different approach that must be undertaken when discussing mental impairments: in this case, plaintiff's bipolar disorder. Title 20 C.F.R. § 404.1520a requires the ALJ to use a "special technique" to determine the severity of mental impairments.[129] The "special technique" should be used at steps two and three of the sequential evaluation.[130] The technique requires the consideration of limitations in daily activities, social functioning, concentration, persistence, and pace, and whether there are repeated periods of decompensation.[131] These elements are the same as the B-criteria used in Appendix 1. Where only mild limitations are noted in the first three categories, and there are no repeated periods of decompensation, the plaintiff's condition will generally be deemed non-severe.[132]

In this case, the ALJ determined that plaintiff's bipolar disorder was severe without first applying the special technique. However, in *Craft v. Astrue*, the court explained that failure to use the technique can result in harmless error if the outcome would have been the same.[133] Here, the ALJ's error did not affect the analysis of plaintiff's ailment or the outcome of the case.  While the ALJ did not apply the special technique at step two of his evaluation of bipolar disorder, the B-criteria analysis he performed under step three is the same. The ALJ adopted the opinion of Dr. Rajasekhar, plaintiff's treating physician, who analyzed plaintiff's bipolar disorder against the B-

---

[129] *See Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008).
[130] *Id.* at 675.
[131] 20 C.F.R. § 404.1520a.
[132] 20 C.F.R. § 404.1520a(d)(1).
[133] *Craft*, 539 F.3d at 675; *see also Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654-658 (6th Cir. 2009)(failure to use special technique was harmless error as plaintiff was not prejudiced or deprived of substantial rights).

criteria.[134] The regulations instruct that in evaluating medical evidence, the opinion of the treating physician should be afforded the greatest weight if it is supported by medical findings and consistent with substantial evidence.[135] Dr. Rajasekhar noted that plaintiff had no limitations in her daily activity, only mild limitations in social functioning and concentration, persistence, and pace and no repeated periods of decompensation.[136] Had the ALJ adopted this assessment at step two he would have determined that plaintiff's bipolar disorder was not severe. However, because he ultimately performed the B-criteria analysis, and used the information in formulating plaintiff's RFC, plaintiff was not unduly prejudiced.

Next, though plaintiff does not challenge Dr. Rajasekhar's assessment, or the ALJ's reliance on it, she instead insists that the ALJ committed error in dismissing the assessment of Dr. Jackson. Plaintiff argues that Dr. Jackson's statement that she could participate in "simple and routine work activities" should be read as limiting Plaintiff to unskilled work. The regulations state that medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence in the record.[137] But in weighing evidence the ALJ must "minimally articulate" his reasons for crediting or rejecting evidence.[138]

The ALJ found Dr. Jackson's assessment inconsistent with the medical record and, if interpreted the way Plaintiff preferred, internally inconsistent. Similar to Dr. Rajasekhar, Dr. Jackson used the B-criteria to evaluate Plaintiff's bipolar disorder. He found that she had mild limitations in daily activities, social functioning, concentration, persistence and pace and one to two

---

[134] R. at 22.
[135] 20 C.F.R. § 404.1527(d)(2)-(d)(6).
[136] R. at 22.
[137] 20 C.F.R. § 404.1527(c)(2).
[138] *Clifford*, 227 F.3d at 870.

periods of decompensation.[139] The ALJ explained that the finding of periods of decompensation was inconsistent with the medical records given that Plaintiff's last hospitalization occurred in the mid-1980's.[140] Regarding Plaintiff's assertion that Dr. Jackson intended to limit Plaintiff to unskilled work, the ALJ stated the following: "[c]ounsel's argument requires reliance on a contradiction that it would create in the document" given that the doctor had determined plaintiff's condition was not severe.[141]

The ALJ did minimally articulate his reasons for giving little weight to Dr. Jackson's assessment. While plaintiff would prefer the ALJ to give greater consideration to the narrative portion of the form, that section is ambiguous at best. Dr. Jackson says, "no evidence that the alleged mental impairment is sufficient severe to prevent the claimant from...participating in simple and routine work activities."[142] It is not clear that the doctor meant to limit plaintiff to unskilled work. And it is not the responsibility of this Court to substitute in for the ALJ's judgment to resolve this conflict.[143] At the very least, Dr. Jackson's assessment was confusing and, as a matter of law, as the non-treating physician his evaluation is not entitled to special deference.[144]

**B.      Residual Functional Capacity Determination**

Plaintiff argues that by not asking the VE a hypothetical question about her mild non-exertional limitations, the ALJ committed legal error.[145] Plaintiff, again, cites no case law supporting

---

[139] R. at 236-48.
[140] R. at 25.
[141] R. at 236-48.
[142] R. at 248.
[143] *Young*, 362 F.3d at 1001.
[144] 20 C.F.R. § 404.1527(f)(2)(i) (providing that the ALJ  is not bound by findings of State agency medical or psychological consultants); *see also Young*, 362 F.3d at 1001-1002 (resolving inconsistencies in medical opinions by crediting one group of physicians over the opinion of another physician); *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994) (crediting opinion of treating physician over examining physician).
[145] Pl.'s Br. 9.

this contention. The ALJ used the VE to assess the exertional level of plaintiff's previous employment but developed an RFC without asking any hypothetical questions.[146] Instead, in determining plaintiff's RFC, the ALJ considered the opinions of physicians, objective test results, and statements made by plaintiff. The Commissioner has responded that the non-exertional limitations gauged by the B-criteria are not used for making vocational assessments and are not required to be included in hypothetical questions.[147]

The use of a VE is discretionary.[148] However, where a non-exertional limitation may have a significant impact on a claimants ability to perform work duties, a VE must be consulted.[149] The regulations state that while the opinions of experts are considered, the final responsibility for deciding the RFC or vocational factors, is reserved to the Commissioner.[150]

The ALJ determines whether a claimants non-exertional limitations would have a significant impact on a claimant's ability to perform work duties.[151] In *Luna v. Shalala*, the court affirmed an ALJ's decision finding no non-exertional limitations where the ALJ had not consulted a VE.[152] The ALJ in that case based the decision on the plaintiff's medical record, evaluations of physicians, and inconsistencies in the plaintiff's testimony.[153] The court determined all of these facts put together were substantial evidence to support the ALJ's conclusion.[154] In addition, the Commissioner cites

---

[146] R. at 62.
[147] Resp. at 5.
[148] 20 C.F.R. § 404.15669(e); *see also, Binion,* 13 F.3d 243, 246 (7th Cir. 1994) (explaining that use of a VE is within the discretion of the ALJ).
[149] *Warmoth v. Bowen*, 798 F.2d 1109, 1110 (7th Cir. 1986).
[150] 20 C.F.R. § 404.1527(e)(2).
[151] *See Burke v. Astrue*, 306 Fed.Appx. 312, 314 (finding mild and moderate limitations in plaintiff's B-criteria and limited him to "reduced but significant range of sedentary work"); *Zalewski v. Heckler*, 760 F.2d 160, 165 (7th Cir. 1985) (explaining that plaintiff was able to perform sedentary work as his non-exertional limitations did not significantly impact his RFC); *see also Luna* , 22 F.3d at 690 (noting that substantial evidence supporting finding that non-exertional limits had no significant impact of claimant's ability to perform sedentary work).
[152] 22 F.3d at 691-692.
[153] *Id.*
[154] *Id.*

an Eleventh Circuit case, *Martino v. Barnhart*, where the court found that the ALJ was not required to include the plaintiff's moderate B-criteria limitations in the RFC.[155] In that case, the ALJ did not consult a VE about the plaintiff's non-exertional mental limitations.[156] Instead, the ALJ gave great weight to the opinions of the plaintiff's treating physicians who found that the plaintiff had no intellectual disorders.[157] The ALJ gave less weight to the assessments of non-treating physicians who found that the plaintiff had moderate B-criteria limitations.[158] As a result, the ALJ determined that the plaintiff's ability to work had not been significantly compromised by her non-exertional limitations.[159] The court held that the ALJ's decision was supported by substantial evidence in the record.[160]

Though the VE was not specifically consulted regarding plaintiff's mild limitations, similar to *Luna*, this fact does not preclude the Court from affirming the ALJ's determination of plaintiff's RFC. Here, the ALJ also considered a number of factors in making the RFC determination. Dr. Rajasekhar's evaluation of plaintiff's bipolar disorder noted no limitations in plaintiff's daily activities and only mild difficulties in concentration.[161] Plaintiff testified that she has been on the same dosage of lithium for twenty-five years and her medical records show, in more than one instance, that she reported feeling stable.[162] Dr. Cavenagh also testified that plaintiff's Graves' disease is currently controlled and her thyroid has been testing normal since March 2007.[163] Additionally, the ALJ noted that while plaintiff had sought treatment for pain associated with her

---

[155] 2002 WL 32881075, 2 (11th Cir. 2002).
[156] *Id.* at 1.
[157] *Id.*
[158] *Id.* at 2.
[159] *Id.* at 1.
[160] *Id.* at 2.
[161] R. at 25.
[162] *Id.*
[163] R. at 24-25.

sinusitis, the record does not reflect complaints to her physicians that the condition increased her fatigue or affected her ability to concentrate.[164]

The only error we find, however, is in the ALJ's consideration of the plaintiff's testimony. The sole evidence supporting the existence of non-exertional limitations was plaintiff's testimony, which the ALJ did not fully credit. The ALJ is, of course, afforded deference in credibility determinations and may determine that a claimant is not credible. But for the reasons discussed below, here the ALJ's assessment of plaintiff's credibility was incomplete. Without a proper understanding of the weight the ALJ ascribed to plaintiff's testimony, there is no way of assessing whether plaintiff's non-exertional limitations were severe enough to be included in a hypothetical question to the VE. While the ALJ did not necessarily commit legal error simply for failing to ask the VE a hypothetical question, the basis of his decision not to question the VE suffers for a lack of consideration of the plaintiff's testimony. As a result, we cannot determine that the ALJ's finding as to plaintiff's RFC was substantially supported.

## C.      Credibility Determination

Plaintiff's final argument is that the ALJ improperly discredited her testimony using "boilerplate" credibility findings and, as a result, committed legal error.[165] The Commissioner highlights that the ALJ found plaintiff credible to the extent that her testimony was consistent with his RFC.[166]

The ALJ is afforded "considerable deference" in determinations of credibility and can only be reversed if "patently wrong."[167] In evaluating symptoms, the ALJ must first establish that there

---

[164] R. at 21.
[165] Pl.'s Br. 11.
[166] Resp. 6-7.
[167] *Prochaska*, 454 F.3d at 737-738 (quoting *Carradine v. Barnhart,* 360.F.3d 751, 758 (7th Cir. 2004)).

is a medically determinable condition that could reasonably be expected to produce the symptoms.[168]

Once that determination has been made, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimants symptoms.[169] Social Security Ruling 96-7 instructs that when discrediting testimony, the ALJ's decision "must contain specific reasons for the finding" and be supported by evidence in the record.[170] That said, a plaintiff's subjective testimony of symptoms cannot be dismissed simply because it may not be supported by objective medical evidence.[171] The regulations explain that in addition to considering objective medical evidence the ALJ should consider a claimant's daily activities, the frequency of symptoms, the dosage and side effects of any medication, and other methods of treatment being pursued.[172]

The ALJ must consider the subjective complaints of a claimant in making a credibility determination. In *Clifford v. Apfel*, the court found that the ALJ's credibility determination lacked a sufficient evidentiary basis.[173] There the ALJ decided that the objective medical evidence did not support the plaintiff's symptoms of pain without specifying the ways in which her testimony was inconsistent with the medical evidence.[174] The court explained that while the ALJ is not required to mention every piece of evidence, he must "build an accurate and logical bridge from the evidence to his conclusion."[175]

In *Parker v. Astrue*, the court sternly admonished an ALJ's credibility determination.[176] The ALJ found the plaintiff's testimony "not entirely credible" without providing a basis for this finding

---

[168] 20 C.F.R. § 404.1529(c).
[169] *Id.*
[170] SSR 96-7.
[171] SSR 96-7.
[172] 20 C.F.R. § 404.1529(c)(3).
[173] *Clifford,* 227 F.3d at 872.
[174] *Id.*
[175] *Id.*
[176] *Parker v. Astrue*, 597 F.3d 920, 921-922 (7th Cir. 2010).

or giving an indication of the degree of weight she gave the plaintiff's testimony.[177] The ALJ used evidence that the plaintiff's physicians were having trouble determining the source of her pain as evidence that the pain did not exist.[178] The court explained that while the lack of objective medical evidence may be a factor in an ALJ's decision making, it cannot be the sole basis for finding that the claimant is not experiencing the alleged symptoms.[179]

In this case, the ALJ found that plaintiff had a medically determinable condition, which could reasonably cause fatigue and lack of concentration.[180] However, he did not fully credit plaintiff's testimony "to the extent [it was] inconsistent with the...residual functional capacity assessment."[181] In considering plaintiff's testimony, while the ALJ took into account the opinions of Drs. Cavenagh and Rajasekhar, he did not adequately evaluate plaintiff's testimony of symptoms.[182]

Plaintiff provided testimony on her daily activities in an attempt to establish that fatigue and difficulty concentrating kept her from working.[183] She explained that her tiredness never goes away and that she "never really feel[s] that great."[184] She also explained that her family used to help her around the house, but that now she handles her own meals and simple chores.[185] Plaintiff testified that she has trouble comprehending things she reads and forgets the content of conversations.[186] She described a situation where she had been fired from a job as a sunroom demonstrator because she

---

[177] *Id.* at 922.
[178] *Id.*
[179] *Id.* at 922-923.
[180] R. at 24.
[181] R. at 24.
[182] R. at 23-25.
[183] R. at 75.
[184] R. at 71.
[185] R. at 75.
[186] R. at 71-72.

was unable to learn about the products quickly enough.[187] Plaintiff claims that her testimony establishes the severity of her condition.

In his decision, the ALJ recounted much of plaintiff's testimony, but he does not analyze her testimony to determine what, if anything, these things indicate about plaintiff's ability to work. Instead, the ALJ proceeded to point out the lack of objective medical evidence supporting her claims of intensity. The ALJ explained that the ME, Dr. Cavenagh, testified that plaintiff's thyroid began testing in the normal range in March 2007 and should not result in functional limitations.[188] The ALJ also adopted Dr. Rajasekhar's assessment of plaintiff's bipolar disorder.[189] The doctor indicated that plaintiff had no limits to her daily activities and only mild limitations in social functioning and concentration, persistence, and pace.[190]

The ALJ did, in fact, point to various places in plaintiff's medical records where she described her symptoms from bipolar disorder as "very controlled" or said she felt stable on the Lithium medication.[191] But the problem is, we do not know how these statements relate to plaintiff's testimony: that she felt stable on her medication does not necessarily contradict plaintiff's testimony that she is fatigued and has difficulty concentrating. While Dr. Cavenagh also testified that none of plaintiff's medications had sedative effects, the ALJ did not mention this in his ruling.[192] The ALJ critically analyzed plaintiff's testimony only twice, first when he noted that her family seemed to have stopped helping her around the house as her Graves' disease had come under control.[193] He also

---

[187] R. at 72-73.
[188] R. at 24. (ALJ's references tests showing the thyroid normal in August, but Dr. Cavenagh testified that the thyroid has been testing in the normal range since March 2007 (R. at 67)).
[189] R. at 25.
[190] R. at 25.
[191] R. at 25.
[192] R. at 75.
[193] R. at 24.

referenced, at step three, her sinusitus. He found that there was "little to support that the claimant's impairment has become so severe that it increases her feeling of fatigue or that it affects her ability to concentrate," then stated that plaintiff had "never reported that the increasing symptoms made her more tired or less able to concentrate" when she was seeking treatment.[194] But this alone, as noted in *Clifford*, is not enough to develop a "logical bridge" to support the finding that plaintiff's testimony is only "partially credible."[195]

As was noted in *Parker*, it may be significant that the objective medical evidence in this case does not seem to support plaintiff's testimony of disabling fatigue and concentration problems. Indeed, the ALJ may ultimately reach the same conclusion here. But to discredit plaintiff's testimony by solely relying on the lack of objective medical evidence is not sufficient. Our ruling to remand this case, therefore, rests solely on the ALJ's need to demonstrate the level of consideration he gave plaintiff's subjective complaints of fatigue and difficulty concentrating.

---

[194] R. at 21.
[195] *Clifford,* 227 F.3d at 872 (finding that minimal daily activities, like chores, do not establish that a person is capable of engaging in substantial physical activity, and requiring remand so that the ALJ could conduct a reevaluation of the claimant's complaints of pain).

## VI.  CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's December 3, 2008 decision requires additional analysis as it relates to plaintiff's testimony. Accordingly, the Court grants plaintiff's Motion for Summary Judgment [dkt 17] and denies the Commissioner's Motion for Summary Judgment [dkt 19].

**IT IS SO ORDERED.**

Date: October 4, 2010

_____
SUSAN E. COX
U.S. Magistrate Judge